Mr. Brown, we'll be pleased to hear from you, sir. Thank you. Thank you, Your Honor. Good morning. May it please the Court, my name is Justin Brown and I'm here on behalf of Stephen Snyder. Your Honors, this is a trial in which the appellant, Mr. Snyder, represented himself pro se while suffering from a neurodegenerative disease. He was denied a jury instruction on his primary defense and his most important witness, who was central to every aspect of this case, was not allowed to testify in a fulsome manner. Simply put... It's an unusual case. It's a highly unusual case, Your Honor. Was he competent to stand trial? Yes, Your Honor, he was competent to stand trial. However, it's our position that... You could go through all kinds of, you know, if you've got a neurological deficit, you've got things going on, you've got expert testimony, the whole bit, that aspect of it. I'm just trying to connect that with, okay, can he represent himself in a pro se capacity if he's competent to stand trial? Right, well, Your Honor, there, of course, there are cases in which the district court has not permitted a pro se litigant to represent himself pro se. What's the district court to do? Because if you had proceeded to trial with the lawyer, then we'd be up here saying, well, I wanted to exercise my right to pro se representation, and you denied me my Faretta rights, so you just put the district court in a position where it's just flip side. Because if he says, well, okay, go ahead, you proceed pro se in spite of all the warnings that have been given, then the district court gets clobbered for allowing him to proceed pro se as you're doing here. And then if the district court said, no, I'm going to appoint a lawyer, and you're not going to be able to proceed pro se, then the district court gets clobbered for that. And then, you know, what's a trial judge to do, I mean, other than what was done here? Well, Your Honor, I think there's a pretty simple answer to that question. The trial court has to make some type of inquiry, some kind of inquiry, any inquiry. But the trial court and the magistrate who handled the Faretta hearings, they did nothing to inquire about Mr. Snyder's ability to represent himself. There was one point, and as Judge Wynn just said, this was a highly unusual case. But there was one point during pretrial motions where Mr. Snyder had, on a break, had fallen in the bathroom, had been on the floor for 30 to 40 minutes, wasn't able to get up until his standby counsel came in. Tell me, one thing you didn't put in your brief, what do you think our standard review is on this? Well, we think this should be a de novo standard of review. And the reason for this… Why would that be? It would seem to me it would be a discretionary call on the part of the district judge as to whether he would recognize the right or not. Well, I think the reason for this, and again it's unique, is you're dealing with a pro se litigant. So to put a burden on him to sort of raise the objection… Well, we are, we are. I mean, this gentleman is an attorney. This is not your usual pro se litigant. This is an attorney, and he actually, from all I can gather, did a pretty decent job of representing himself. He was told about all the liabilities of proceeding pro se. He was, you know, the magistrate judge told him twice, you know, you're running a real risk here. And he says, no, I'm going to go pro se. And if the district court had denied him the right to proceed pro se, he would have been screaming bloody murder up here that his constitutional right was denied. I mean, it's a no-win situation for a trial court. Right. Your Honor, what I would suggest, though, is where the magistrate judge felt short is, yes, he continually asked Mr. Snyder, are you sure you want to do this? Are you sure you want to do this? Do you understand the risk? He insisted he did want to do it. That's right, but at no point did the magistrate judge inquire as to his ability to do it. He was never questioned about the neurodegenerative disease that he was suffering from. There wasn't a single question about that. There wasn't a single question about whether he was able to manage the— Because he was competent to stand trial. You've already said that. And by being competent, you now are arguing the court was required to appoint him a counsel. Where does that take us? I mean, because there are so many other pro se defendants, they wouldn't do anywhere near the job here, as Judge Wilkerson said. So what—I mean, it would be required in those cases, then? And, Your Honor— There's a difference between could appoint and required to appoint someone under these circumstances, where he's competent to stand trial. You've admitted that right off from the bat. So you can talk about his neurological defects and all that other stuff, but he's competent to stand trial. From the physical perspective and mental perspective, that much to stand trial, he can do so. The question then becomes, if he chooses to represent himself, now is the court required to appoint him a counsel? And I'm not sure that leads you to a de novo review on that question, but proceed. Well, and I understand Your Honor's point that there are challenges here. But what I would suggest is that there is a narrow path. Is he competent to stand trial? Absolutely. We don't dispute that. But there is case law, Indiana v. Edwards. It's a Supreme Court case. And Frazier L. out of the Fourth Circuit. And those cases recognize that the judge may revoke pro se status. See, the words you just used make what you're now saying required. Okay, and I'm hearing a couple different things, too, because it seems to me you're saying that the Feretta hearings were incomplete. And that in itself is the basis for reversing the conviction. Is that correct? Well, what I'm saying— The Feretta hearings didn't go far enough? What should the magistrate judges have asked that was not asked? Collectively, the two courts, the district court and the magistrate, they should have at least initiated some type of inquiry. What are you saying? Should have given them a test on the law? In other words, you're writing the opinion of the court consistent with your stated position. What did the court do wrong? And when should the court have intervened? At the beginning of trial? At a recess? What point did the court abuse its discretion? Your Honor, at the point in pretrial motions when it was revealed to the court that Mr. Snyder was being investigated for having Parkinson's disease, at the point when he had just fallen and been on the floor of the men's room for 30 to 40 minutes, until his standby counsel went in and picked him up and brought him back into the courtroom, when he was bleeding from his head and he was bleeding from his arm, I would suggest that was the time when the district court should have asked a question, a simple question. Is this person okay? Is this person able to represent himself? And the record— He did a pretty good job. I mean, this is not a question of somebody who is incapable of standing trial. He's an attorney, and he wants to represent himself. And if he didn't represent himself, he would be resentful forever after. He said, if I represented myself, I could have gotten an acquittal. And the magistrate judge held not one but two Faretta hearings. I find myself asking Judge Keenan's question about what in the world a magistrate judge or a district judge could do. And, again, you look at the record here, you look at the cross-examination, you look at the closing argument. It's pretty good. Your Honor, I would remind the court that he was held in contempt and locked up in jail overnight because the district court found that he was not following instructions, that he wasn't complying with the rules of the court. So were there points when he asked a good question? Of course there were. But there were hundreds, perhaps 200, 300, 400 sustained objections coming not only from government counsel, but also from the bench. I mean, this was the most combative trial imaginable. Your Honor, I would also like to carve out a little bit of time for another one of our issues. And that specifically is the advice of counsel issue. And this was Snyder's primary defense at trial. And it should come as no surprise that this was his primary defense because in 2018, initially, the U.S. Attorney's Office had declined to prosecute this case because it concluded that he was acting under advice of counsel. There was a plethora of evidence that he was using counsel and they were advising him throughout this process. The problem was they found they didn't fully disclose him to that counsel. That was the conclusion that the district court reached. But there was a lot of other evidence indicating that he did make a fulsome disclosure. What did the counsel say? I'm sorry? The counsel, the one he's supposed to get advice. How did he put it? He said that he had a general understanding of what was going on. He had provided him with a template. Did he say it had been fully disclosed to him and he had all of the information and, therefore, I gave him advice based upon that or he got a general understanding? That's, you know, unfortunately, there were not – that specific question was never asked of him. That's the problem. If you go to a lawyer and get advice, if you don't tell him all the facts – and this lawyer didn't know all the facts. I mean he made that very clear. I didn't know all this. And then you get advice. He gave advice based upon the facts that were given him, but he was not giving all of the facts or the essential facts to him. And, Your Honor, that was the government's argument, right? This was a factual dispute. The government argued that all of the relevant facts had not been provided to counsel. There's also the defendant's perspective or the appellant's perspective in this case where there was a plethora of evidence that he did. He wanted counsel to be included on everything. He wanted counsel to be included on phone calls. He wanted counsel to be there for meetings. The problem and the mistake that the district court judges is that they only viewed the evidence in the light most favorable for the government. I'm just – I'm not trying to be argumentative, but it just seems to me I don't think he disclosed to them he was trying to run a blackmail scheme against this hospital to get $25 million from them. I don't think he went to counsel and said that, and that's what I want to be able to do. And the counsel says that's okay. Counsel was aware that as an initial bargaining position, he was seeking $25 million over 10 years?  This was a consultancy. This was a consultancy. But he was seeking it for himself personally. That's correct. It was a consultancy that he was going to fulfill. And he was trying to get $25 million for himself personally in exchange I won't file suits and bring out some information. That sounds like pure blackmail to me, but I – at least from a – just an initial impression as a lawyer to give advice. If a client comes and tells you that, you're probably not going to turn around and say, oh, that's okay. You can do it that way. Your Honor, he not only had one lawyer. He actually had three lawyers. The other lawyers, Eric Yaffe and John McNutt, he was consulting on them regarding these issues. He was consulting about them on the demand letter that was initially sent to the hospital. There was all kinds of evidence there, and it was his client. It was his client, Michelle Sanders, who wanted the consultancy and who suggested the consultancy. But the problem that the district court made – I thought he was seeking the $25 million for himself. Your Honor, that was explained to his lawyers, and they were trying to figure out – Is that true? I mean you said his client wanted him to do it. I don't think the client wanted him to go get $25 million for himself. The client was aware of that figure. But there was no benefit to the client for him to get $25 million personally. The client – there was a benefit to the client in that what the client wanted was for this department of the hospital to clean up its act. I mean that was one of her primary goals, and that was stated very early on in this case in mediation. Isn't that a jury question? Your Honor, these are all jury questions. That's the problem with the judge's decision to not give the jury instruction. That's the same as directing a verdict. Basically, the district court directed the verdict on this issue, on the advice of counsel issue, and when it does that, it needs to be – He didn't direct the verdict. He just said there wasn't a sufficient evidentiary foundation for the instruction. Then the court really did give some latitude allowing him to argue the advice of counsel, didn't the court? I think that – and I'm sorry I'm over my time if I can continue, but I think the Hicks case is instructive on that. When the court doesn't give a jury instruction, it is essentially directing a verdict on that issue, and it can only do that if it's viewed the light. It's not directing a verdict on the issue because you're still able to argue it. Judge Keenan's right. You still have plenty of options to get that. It's not an instruction on nothing. The judge was standing in the place of the jury and weighing one set of facts against another and choosing the government's side. That's just ruling on a rather ordinary question we have as to whether the failure to give a specific instruction is an abuse of discretion. We have these things all the time. Nobody's ever suggested a declination to give a particular instruction as directing a verdict. Well, at any rate, you've got some rebuttal time, okay? Thank you, Your Honor. I'm going to ask my colleague, Jim, here. Barbara, do you have any questions? Thank you. Ms. Munoz, happy to hear from you. Good morning, Your Honors, and may it please the court. I'm J. Kirsh Munoz for the United States. In 2018, Mr. Snyder tried to finagle a $25 million personal payment from the University of Maryland medical system. He did so by threatening to unleash a media campaign calculated to destroy the hospital, its transplant program. What's our standard of review on this issue that's before us? On the competency issue, Your Honor, that's actually a really great question. And I don't believe this court has ever articulated a standard of review with this kind of Edwards challenge. Because, of course, Edwards holds that the Constitution permits interfering with a threat request for gray area defendants, which suggests an abuse of discretion standard in that kind of case and may suggest an abuse of discretion standard here as well. But even still, Edwards does not speak directly to the question raised by Mr. Snyder, which is when, if ever, the Constitution requires the court to... Why wouldn't it be a discretionary call as to whether the individual here should be allowed to per se, proceed per se or not? Nobody's talking about complete deprivation of the right to counsel. But it's a discretionary call as to whether the defendant is going to be allowed to proceed per se. How does that transform into de novo review? Well, Your Honor, I'm certainly not arguing it's de novo. I'm saying at worst it's abuse of discretion because we still don't know. And again, we don't have to figure this out in this case. But we don't know when the Constitution requires the court to impose counsel on a gray area defendant, which is what Edwards does not say. Edwards says only that a district court may force counsel on a gray area defendant even if he is unwilling. So given the nature of the distinction between that which is constitutionally required and that which is merely constitutionally permitted, the abuse of discretion standard that the Edwards Court applied may be even too generous for what's going on here. But I will accept, certainly for purposes of this argument, that we're operating under abuse of discretion here because Edwards does, of course, confer discretion on a district court in limited circumstances. Even with that, Mr. Brown acknowledges that the defendant here was competent to stake a fraud. Does it then follow that he is competent to waive his right to counsel? Yes, Your Honor, that is exactly right. The standard for competency to stand trial and to waive the right to counsel is the same. It's the two-part Dusky Standard. And this court held in Bernard and reaffirmed in Ziegler that a district court is not required to do anything more than ensure a defendant's competence under the two-part Dusky Standard. And, of course, ensure that the waiver of counsel is knowingly and voluntarily made. And, of course, the court did exactly that here. It wasn't required. The magistrate judge, as well as the district court, was not required at any point to conduct an additional Edwards inquiry, for lack of a better term, to determine whether Mr. Snyder was capable of effectively representing himself. He only needed to be, you know, competent under the Dusky Standard, and that resolves this case. What about the advice of counsel question? Sure, Your Honor. So I'd like to point out, I think, what Mr. Brown did not say, either in his briefer up here at the podium. He has not pointed to any evidence still that his attorneys knew about the tactics that Mr. Snyder employed to obtain the consulting agreement, much less advised him that he could use such tactics. And that alone should close the book on this issue. An attorney can't evaluate whether his client's actions cross a line into extortionate conduct unless the attorney knows both the demand made, which is here the consultancy, the terms of the consultancy, and the threats used to support it. And, of course, in this case, that's the negative media. Judge Wynn hit the point on the head, didn't he, that if you're going to have an advice of counsel defense, you've got to tell counsel all the facts. And the problem here was that the lawyer did not have the kind of facts that enabled him to render an informed advice. And that's a matter of trial management. The district court's decision to give or not to give a particular instruction, the district court says the evidence here that the lawyer knew all that he needed. There's no evidence here that the lawyer knew all he needed to know in order to render competent professional advice. That's the kind of thing we would normally leave to trial court case management. That's exactly right, Your Honor. And the district court found, quote, certainly there is no evidence that Mr. Graham blessed what Mr. Snyder did during these meetings. And the record very much bears that out. None of his attorneys testified, and there's no record in the evidence, suggesting that they knew the means by which he sought to obtain the consultancy agreement, which, again, is the threat of a negative media blitz that was actually unconnected to his client's case. Because certainly by the second meeting, the June meeting, he had said, okay, fine, you settle this case with my client for what I think that's worth between $3 million and $5 million, but I want you to pay me separately. I want you to pay me $25 million, or I will unleash this negative press campaign against the hospital. I'll drum up national and local interest in the alleged fraud that the hospital is committing. And that is, I think, pure blackmail. That's the kind of shakedown that I think really distinguishes this case and what Mr. Snyder did here from the SCAD and retainer agreement that was held up as a model by one of his experts at trial. Obviously, in that case, the SCAD and partner was not threatening the company he was seeking to be on retainer with blackmail. And so, Your Honor, I really do think that there's no basis for an advice of counsel instruction. The district court was completely right about that. Do you have anything further? I do not, Your Honor. Unless Your Honors have additional questions, we would just ask this court to affirm across the board. We have nothing further. Thank you. Thank you so much. Mr. Brown. Thank you, Your Honor. I would like to just clarify one point that's already come up. And the question of whether Snyder told his lawyers all of the relevant facts pertaining to this, that's a question for the jury to answer. If one were to view the facts of the case in the light most favorable to Mr. Snyder, one could reach the conclusion that he had been fully transparent with his lawyers. In fact, he twice set up a meeting in which Andy Graham met with the plaintiff in the underlying MedMal case. So he also attempted to initiate phone calls between Mr. Graham and attorneys for UMMS. And he also attempted to bring Mr. Graham to meetings with UMMS. So if one were to look at those facts, you could reach a conclusion that there was full transparency with his lawyer. And that's the lens from which the district court should have looked at this issue. Any dispute of facts, that's a question for the jury, not for the district court to make. I would like to touch on one other issue, a third issue that we also raised in our briefing. And that was the testimony of Michelle Sanders. She was Mr. Snyder's client. She is the one who from the outset requested the consultancy with the hospital. And when she was called as a witness, her testimony was severely limited because every time Mr. Snyder tried to ask her a question, the court allowed her to not answer it based on a nondisclosure agreement that was in the settlement agreement. So what you had in this issue was a conflict between Mr. Snyder's right to present evidence in his own defense and a nondisclosure agreement within that settlement. And the judge never even considered the weight of those two concerns. There was no consideration whatsoever. And what actually happened at the trial was that the witness's lawyer, who was in the gallery, was objecting from the gallery and the court was deferring to him as to whether Ms. Sanders could have asked a particular or could have answered a particular question. But the court wasn't made aware before trial of the nondisclosure agreement, was it? That's true. I mean, it did come up. This sort of landed on the court at the last minute. Does that have an impact on our review? I think that, again, and that is sort of related to the pro se status of Mr. Snyder. I think if he had been represented by counsel, that might have played out a little bit differently. But I think the fact that the issue came up at the last minute does not alleviate the district court judge's duty to at least weigh those two competing interests, the nondisclosure agreement versus his constitutional right to put on evidence in his own defense. Well, didn't he get it in? I mean, other witnesses testified to much of what was there. I mean, what additional testimony was she going to add to this? Your Honor, there was a lot of things that she would have added that he tried to ask her. She was aware that the department, as a result of this lawsuit, had taken down its promotional videos. She was aware of other remedial measures that the hospital had taken. She was aware that five transplant surgeons had been fired from this division as a result of this. Now, let me understand. How does that apply to extortion? It goes to Snyder's state of mind. As a defense. It goes to the wrongfulness element of extortion. He reasonably believed that there was widespread malpractice and widespread fraud going on at this department. And then reasonably concluded he could get $25 million to say, I won't tell anybody about it. It goes to the comments that were made about the economic harm that could be inflicted on the hospital. That if this widespread fraud and malpractice was going on, he could then advertise for clients and presumably get clients. And we see this on TV every day. And that could have generated many, many millions of dollars in damages against the hospital. So what it does is it explains his frame of mind, his basis of knowledge, and it goes to the wrongfulness element of extortion. So you think ultimately if you take it in his light, what he was trying to do was legal. From your perspective, you think that's legal? I go to the hospital. You see all these things going on. You give me $25 million. You can stop these things, save people tons of money. And that's good. The lawyer walks out with his $25 million. The hospital stops it. The public is benefited. That's legal. Your Honor, the figure of – Just answer that question. I want to know. Maybe I'm not trying to be absurd about it, but I'm just thinking that's basically what happened. Do you think that's a defense for that? If there was malpractice and widespread fraud going on inside of that union. He knows all about it. An attorney can initiate an advertising campaign. But that's not what happened here. What the attorney did is walked in there to talk to some people and said give me $25 million, and I will – and you go clean this up. And I will say it won't bring actions. His client specifically asked him to do a consultancy with the hospital. Right, but then when she found out the terms of what he was thinking about, she was opposed to it. Well, she was made aware of some of the terms, and no deal had been fleshed out. It was still in the negotiating process. So there was no final deal in that respect. The point was made that Sanders was on the witness stand for an extended period and that he was able – your client was able to cross-examine her extensively. And I think the comment was made somewhere that he asked more than 300 questions of Ms. Sanders. So it's not as if she was an absent figure. 300 questions, that's a little bit more than usual cross-examination. Well, and I would also point out, Your Honor, that there were about 10 questions that were asked of her, which she did not answer under the instruction of her counsel who was sitting in the gallery. And she did not answer those because of the nondisclosure agreement. So you're saying there were 290 questions? Your Honor, it's not always quantity, sometimes it's quality. Thank you, sir. Thank you very much, Your Honor. We will adjourn court and come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Barbara Milano Keenan